J-S20028-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| IN RE: TERMINATION OF PARENTAL RIGHTS TO: N.I.M.R., A MINOR. | : IN THE SUPERIOR COURT OF<br>: PENNSYLVANIA<br>:<br>:<br>: |
| APPEAL OF: K.N.R., MOTHER | :<br>:<br>:<br>:<br>:<br>: No. 369 EDA 2026 |

Appeal from the Decree Entered December 29, 2025
In the Court of Common Pleas of Lehigh County Orphans' Court at No(s):
A2024-0033

| | |
|---|---|
| IN RE: TERMINATION OF PARENTAL RIGHTS TO: G.J.M.R., A MINOR. | : IN THE SUPERIOR COURT OF<br>: PENNSYLVANIA<br>:<br>:<br>: |
| APPEAL OF: K.N.R., MOTHER | :<br>:<br>:<br>:<br>:<br>: No. 370 EDA 2026 |

Appeal from the Decree Entered December 29, 2025
In the Court of Common Pleas of Lehigh County Orphans' Court at No(s):
A2024-0032

| | |
|---|---|
| IN RE: TERMINATION OF PARENTAL RIGHTS TO: B.J.M.R., A MINOR | : IN THE SUPERIOR COURT OF<br>: PENNSYLVANIA<br>:<br>:<br>: |
| APPEAL OF: K.N.R., MOTHER | :<br>:<br>:<br>:<br>:<br>: No. 371 EDA 2026 |

Appeal from the Decree Entered December 29, 2025
In the Court of Common Pleas of Lehigh County Orphans' Court at No(s):
A2024-0031

BEFORE:  NICHOLS, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY McLAUGHLIN, J.:                    **FILED JULY 7, 2026**

K.N.R. ("Mother") appeals from the decrees terminating her parental rights to N.I.M.R., G.J.M.R., and B.J.M.R. ("Children").[1] She argues the court erred in finding termination proper under 25 Pa.C.S.A. § 2511. We affirm.

In January 2023, the Lehigh County Office of Children and Youth Services ("CYS") received a call following the near fatality of B.J.M.R., who was one month old at the time. CYS took emergency protective custody of Children. Following a shelter care hearing, Children were ordered to remain in the legal and physical custody of CYS, and the court subsequently adjudicated Children dependent. In September 2024, CYS filed a petition to terminate Mother's parental rights.[2] The court held a hearing on the petition.

The trial court accurately summarized the testimony and evidence presented at the hearing, and we adopt and incorporate the court's factual and procedural summary. **See** Trial Ct. Op., filed Dec. 29, 2025, at 1-15. Briefly, Children have most recently been involved with CYS since January 2023. Mother's goals included to 1) obtain and maintain appropriate housing and legal income; 2) cooperate with reunification/in-home services; 3) complete a mental health evaluation and follow any recommendations; 4)

_____

[1] N.I.M.R. was born in February 2020, G.J.M.R. was born in December 2020, and B.J.M.R. was born in December 2022.

[2] The court also terminated Father's parental rights. That decree is not at issue in this appeal.

complete a protective parenting evaluation and any recommendations; and 5) attend supervised visitation consistently with Children.

During the dependency proceedings, Mother's housing was "inconsistent and unstable," and her employment was "sporadic or non-existent." *Id.* at 5, 7. Mother was discharged unsuccessfully from Signature Family Services in November 2023, due to a lack of cooperation, last-minute cancellations, and no-shows. She was also discharged unsuccessfully from JusticeWorks in March 2024 because of a lack of compliance and failure to maintain in-person contact with the assigned workers. In May 2024, Mother was referred to Valley Youth House, and although initially she was noncompliant, after the assignment of a new case worker, she was compliant with working on her goals, except that she did not address the mental health component of her reunification goals.

During the dependency proceedings, Mother either did not attend mental health therapy or attended sporadically. Mother underwent a psychological evaluation on September 21, 2020, during prior CYS involvement with the family, and in May 2023. Mother did not engage in the evaluations' treatment recommendations except that she was not the caregiver to Children and her visits with Children were professionally supervised.

Mother attended visits with Children sporadically until January of 2024. In February of 2024, Mother stopped communicating with the Agency, and did not visit Children for approximately two months. After one visit in March 2024, Mother did not visit Children until October 2, 2024. In the last review period

prior to the termination hearing, Mother had been "fairly consistent" with the visits, brought snacks for Children, stayed focused on and engaged with Children, and "mutual affection [was] expressed between Mother and [C]hildren at the visits." *Id.* at 15.

The trial court granted the petition to terminate Mother's parental rights, finding CYS established grounds for termination under Section 2511(a)(1), (2), (5), and (8) and that termination would best meet Children's needs and welfare under Section 2511(b). Mother filed a timely appeal.

Mother raises the following issues:

> A. Did the trial court err as a matter of law and/or abuse [its] discretion in finding that [CYS] met the requirements of 23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(5), and (a)(8) by clear and convincing evidence?
>
> B. Did the trial court err as a matter of law and/or abuse [its] discretion in finding that [CYS] sustained their burden of proof by clear and convincing evidence that the termination of biological parents parental rights to [Children] best meet the needs of welfare of the child[ren] as required by 23 Pa.C.S.A. § 2511(b)?

Mother's Br. at 4 (suggested answers and unnecessary capitalization omitted).[3]

We review an order involuntarily terminating parental rights for an abuse of discretion. *In re G.M.S.*, 193 A.3d 395, 399 (Pa.Super. 2018). In termination cases, we "accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re*

_____

[3] CYS and counsel for Children filed appellee briefs in support of termination.

***T.S.M.***, 71 A.3d 251, 267 (Pa. 2013) (quoting ***In re Adoption of S.P.***, 47 A.3d 817, 826 (Pa. 2012)). "If the factual findings have support in the record, we then determine if the trial court committed an error of law or abuse of discretion." ***In re Adoption of K.C.***, 199 A.3d 470, 473 (Pa.Super. 2018). We will reverse a termination order "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." ***In re Adoption of S.P.***, 47 A.3d at 826.

A party seeking to terminate parental rights has the burden of establishing grounds for termination by clear and convincing evidence. ***In re Adoption of K.C.***, 199 A.3d at 473. Clear and convincing evidence means evidence "that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." ***Id.*** (citation omitted).

Termination of parental rights is controlled by Section 2511 of the Adoption Act. ***In re L.M.***, 923 A.2d 505, 511 (Pa.Super. 2007). Under this provision, the trial court must engage in a bifurcated analysis prior to terminating parental rights:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis

> concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Id.* (citations omitted). To affirm the termination of parental rights, this Court need only affirm the trial court's decision as to any one subsection of Section 2511(a). *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).

Mother first argues the court erred in finding termination proper under Section 2511(a)(1), (2), (5), and (8). She claims she did not have documented mental health issues and sought counseling and treatment multiple times. She maintains that she has performed basic parental duties, and that she "voluntarily offered that she was diagnosed previously with bipolar disorder and had been seeking treatment through the [Hispanic American Organization ("HAO")]." Mother's Br. at 15. She points out that CYS sent releases of information to HAO to obtain information on the treatment but HAO did not respond and argues that the lack of response by HAO was not her fault. Mother also notes there was testimony that there was a reciprocal bond between Children and Mother and that she did not have issues with visitation and brought snacks. Mother argues that although she did not achieve her stable income and housing goals, she had employment and housing for portions of the time. She maintains she "was working diligently and remediating the issues that brought [C]hildren into care and demonstrating capacity to do so." *Id.* at 16.

As only one basis for termination under Section 2511(a) is necessary, we will focus on the court's termination of Mother's parental rights under subsection (a)(2), which states:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

Section 2511(a)(2) requires the moving party to prove three factors by clear and convincing evidence: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re K.Z.S.*, 946 A.2d 753, 758 (Pa.Super. 2008) (citation omitted). "[P]arental incapacity that cannot be remedied" under Section 2511(a)(2) includes not only "affirmative misconduct" but also "acts of refusal [and] incapacity to perform parental duties." *Id.* (citation omitted). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *Matter of Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa.Super. 2017) (citation omitted).

Here, the trial court pointed out that Children had been in the care and custody of CYS since January 2023 and in the two and a half years since that time Mother had made little to no progress on her goals. Among other things, the court found Mother had not addressed her mental health needs, engaged in protective parenting treatment, or demonstrated she was capable of maintaining stable housing and income. She also had not performed parental duties or provided Children with the parental care, control, or subsistence they need. The record supports the court's factual findings and it did not abuse its discretion in finding termination proper under Section 2511(a)(2). Following review of the parties' briefs, the certified record, the relevant law, and the well-reasoned opinion of the Honorable Melissa T. Pavlack, we affirm this issue on the basis of the trial court opinion. *See* Trial Ct. Op. at 18-19.

Mother next argues the court abused its discretion in finding CYS established by clear and convincing evidence that termination best met Children's needs and welfare under Section 2511(b). She argues that many of the barriers to her custody were beyond her control, such as housing and her bipolar depression disorder. She argues that she demonstrated a substantial bond with Children, and that the bond is reciprocal, which was demonstrated through her visitation and interaction with Children. She claims a CYS caseworker testified Mother was "loving, focused, and engaged." Mother's Br. at 20. She points to the testimony of multiple CYS caseworkers that she had a bond with Children and maintains that it would be detrimental to Children to sever that bond.

Under Section 2511(b), the trial court must consider "the developmental, physical and emotional needs and welfare of the child" to determine if termination of parental rights is in the best interest of the child. *See* 23 Pa.C.S.A. § 2511(b). This inquiry involves the assessment of "[i]ntangibles such as love, comfort, security, and stability[.]" *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super. 2005). The court must also examine the parent-child bond, "with utmost attention to the effect on the child of permanently severing that bond." *Id.* However, the "mere existence of an emotional bond does not preclude the termination of parental rights." *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011). Rather, the trial court must consider whether severing the bond "would destroy an existing, necessary and beneficial relationship." *Id.* (citation omitted). The court must also examine any pre-adoptive home and any bond between the child and the resource parents. *In re T.S.M.*, 71 A.3d at 268.

Here, the trial court pointed out that Mother's visits were sporadic and she often canceled the visits, but the visits became "fairly consistent" following the filing of the petition, and that she brought snacks and engaged with Children when she attended visits. Trial Ct. Op. at 22. The court found Children and Mother had affection for each other. The court further found Children had a bond and significant relationship with the foster family, who tended to their daily needs, health concerns, and developmental needs. The court found Mother was unable to provide Children with the security and stability they needed. It concluded the "benefits of stability and permanency in this stable,

consistent, loving [foster] home outweigh[ed] any potential detriments that may occur due to severance of the bond [C]hildren may be starting to have with Mother" and "it best serve[d] [C]hildren's needs and welfare to terminate both parents' rights so they can achieve permanency with this loving, secure, nurturing and stable foster family." *Id.* at 23. The record supports the court's factual findings and it did not abuse its discretion in finding termination proper under Section 2511(b). After review of the briefs, relevant law, certified record, and the trial court opinion, we affirm this issue as well on the basis of the trial court opinion. *See* Trial Ct. Op. at 21-23.

Decrees affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/7/2026

- 10 -

IN THE COURT OF COMMON PLEAS OF LEHIGH COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

In re: Involuntary Termination of Parental Rights to :
            **N.I.M.R.,**          :      File Nos.  **A2024-0033**
            **G.J.M.R.,** and   :                **A2024-0032**
            **B.J.M.R.,**         :                **A2024-0031**
               Minors      :

## MEMORANDUM OPINION

Before the Court for determination are the *Petitions for Involuntary Termination of Parental Rights of [K.N.R.], Mother, Pursuant to Sections 2511 and 2512 of the Adoption Act; Petitions for Involuntary Termination of Parental Rights of [B.J.M.J..], Father, Pursuant to Sections 2511 and 2512 of the Adoption Act;* and the *Petition for Biological Father [of B.J.M.R.] to be Declared Unknown and Unascertainable,* all filed September 9, 2024, by the Lehigh County Office of Children and Youth Services (hereafter, "LCOCYS" or "the Agency") regarding N.I.M.R., a minor (hereafter, "N"), a female born February █ 2020; G.J.M.R., a minor, (hereafter, "G"), a male born December █ 2020; and B.J.M.R., a minor (hereafter, "B"), a female born December █ 2022. A hearing began on March 27, 2025, and concluded on June 26, 2025. Notes of Testimony were filed July 21, 2025,[1] and Proposed Findings of Fact and Conclusions of Law

---

[1]   Notes of Testimony from March 27, 2025, are designated "N.T. I," and Notes of Testimony from June 26, 2025, as "N.T. II."

Exhibits in this matter were entered into each of the three minors' Orphans' Court file numbers and were identical except that the certified Court Orders in each minor's dependency case were entered into that minor's Orphans' Court file. For ease of reference, all citations to exhibits in this Memorandum Opinion are to the exhibits filed to Orphans' Court File Number A2024-0031, which is the file regarding B.

1

were filed by the Agency on August 18, 2025, by counsel for the children[2] on September 18, 2025, and by counsel for Mother and counsel for Father on September 19, 2025. The Court has carefully considered all of the evidence of record. The matter is ripe for decision.

The mother of all three children is K.N.R. (hereafter, "Mother"), and B.J.M.J. is the father (hereafter, "Father") of N and G (N.T. I, 15-16); however, paternity testing performed in November of 2023 excluded him as the father of B (N.T. 1, 53). Despite diligent inquiry to ascertain the identity of B's father, the Agency was unable to establish his identity (N.T. II, 77, 88-89) and therefore filed both a petition to terminate any rights B.J.M.J. may have as father as well as a petition to declare B's father unknown and unascertainable.

The Agency has been involved with Mother and her children since 2014.[3] On January 22, 2023, LCOCYS received a Child Protective Services ("CPS") referral regarding the near fatality of then-one-month-old B, who had to be taken to the emergency room after having been found in Mother's home hypothermic, wet, covered in makeup, and barely responsive.[4] (N.T. I, 11, 31-32,

---

[2] Lori A. Stauffer, Esquire, was appointed as counsel for the minors. There was no conflict between the minors' legal interests and best interests.

[3] The Agency had prior involvement with Mother for A.P.-R. and N.P.-R., Mother's two older children, whose father is V.P.-R., beginning in 2014 due to Mother's unstable housing and homelessness; although they were placed in LCOCYS custody, they were returned to Mother's care, and the Agency closed its case in 2015. (N.T. I, 5-9.) A new referral regarding home conditions in October of 2018 resulted in A.P.-R. and N.P.-R. being adjudicated dependent. (N.T. I, 6-8.) The Court takes judicial notice that in May of 2021, the Agency filed petitions in the Orphans' Court pursuant to 23 Pa. C.S. §2511 regarding both A.P.-R. and N.P.-R., but withdrew the petitions just four months later. The Agency officially opened a case with N and G in September of 2022 as a result of concerns about housing instability after Mother was evicted from her residence that month. (N.T. I, 9-10.) At that time, Mother was pregnant with B, who was born just three months later, and the Agency was trying to work with Mother to come up with a plan to address homelessness. (N.T. I, 10.) In light of the evidence adduced in this hearing about Mother's noncompliance regarding A.P.-R. and N.P.-R., *see infra* note 16 and accompanying text, it is unclear how or why A.P.-R. was in Mother's care in January of 2023 when B was discovered in a dire, nonresponsive state.

[4] The CPS investigation eventually was deemed "unfounded" in regard to Mother. (N.T. I, 25.)

2

173; Ex. P2A-10.) After hosting an adult party in her home the night before, Mother did not wake up easily that morning. (N.T. 31; P2A-10; Ex. P6 at 5.) She could not explain B's perilous condition. She thought one of her two-year-old toddlers, who loves to play with makeup, may have put the one-month-old infant in the shower. (N.T. I, 11; Ex. P6 at 2.) At the time, B, G, N, and an older child aged 9, A.P.-R., were living with Mother. (N.T. I, 11-12, 14, 31, 173, 187.) A.P.-R. is not part of these proceedings.[5]

Due to safety concerns regarding Mother's ability to care for the four children in her custody, the Agency sought to establish a safety plan under which Mother's contact with the children would be supervised. (N.T. I, 12.) Mother did not wish to cooperate with the safety plan, and on January 23, 2023, the Agency took emergency custody of N, G, and B and placed them in kinship care with their maternal aunt.[6] (N.T. I, 12-14.) B was still hospitalized at the time. (N.T. I, 13.) When her children were removed from her care, Mother voluntarily admitted herself to Lehigh Valley Hospital-Muhlenberg's psychiatric unit. (N.T. I, 14; Ex. P6 at 4.) At the time, Father was

---

[5] *See supra* note 3.

[6] Since that time, N, G, and B have not been able to return to Mother's care. Before the first permanency review hearing in April of 2023, the three children were all moved to a foster home through the Salvation Army. (N.T. I, 36.) At some point, N was moved to a new foster home as a result of behavioral concerns, and eventually, B and G were moved to that foster home as well; however, when that foster family gave notice that it was a legal risk home for just one of the three children, the Agency searched for a foster placement that could be a legal risk home for all three children. (N.T. I, 82, 127-30.) On October 18, 2024, the three children began spending weekends in a new legal risk foster home with a couple that was specifically chosen for the training and experience they had with helping children dealing with trauma. (N.T. I, 82-83, 113, 130-31; N.T. II, 72.) The weekend respites were gradually extended from Friday to Sunday, then Friday to Monday, then Thursday to Monday, then they had an extended holiday visit lasting from December 20, 2024, until the three children were officially moved into the new foster home on January 7, 2025. (N.T. I, 82-83; N.T. II, 72-73.) The children have developed a bond with their foster father and foster mother, who meet all of their needs and would like to adopt all three children if parental rights are terminated. (N.T. I, 83, 107; N.T. II, 71-74.)

3

incarcerated at State Correctional Institution-Dallas ("SCI-Dallas") on drug charges. (N.T. I, 16-17, 21; Ex. P1 at 8-14.)

A Shelter Care hearing was held on January 25, 2023, and the children were ordered to remain in the legal and physical custody of LCOCYS pending an adjudicatory hearing. (Ex. P2A-5 – P2A-8.) After hearing held January 31, 2023, all three children were adjudicated dependent; legal and physical custody were granted to LCOCYS. (Ex. P2 at 10-13.) In order to help effectuate reunification, Mother was ordered to 1) obtain and maintain appropriate housing and legal income; 2) cooperate with reunification/in-home services; 3) complete a mental health evaluation and follow any recommendations; 4) complete a protective parenting evaluation and any recommendations; and 5) attend supervised visitation consistently with the children. Father was ordered to obtain and maintain appropriate housing and legal income upon release from incarceration and to contact the Agency if he wished to be a resource for the children. (Ex. P2 at 12.)

Permanency hearings were held on April 25, 2023; October 24, 2023; April 16, 2024; October 15, 2024 (N.T. I, 21, 36, 81-82; 94; *see* Ex. P2A generally). Mother's court-ordered recommendations did not change. (N.T. I, 24, 45, 88.) Father remained incarcerated until September 6, 2023. (N.T. I, 23, 45.) He reached out to the LCOCYS caseworker the next day and met with her, with Mother present, at which time they presented to the Agency as a couple to be a resource for the children, and the Agency added him to Mother's reunification services with Signature Family Services, but we note that there was no court-ordered requirement for Father to participate with reunification services. (N.T. I, 45, 47; Ex P2A.) Father's court-ordered recommendations remained the same throughout the dependency proceedings except that at the October 24, 2023, permanency review hearing, the Court ordered Father to complete paternity

4

testing regarding B, with which he complied. (N.T. I, 24, 49, 94; Ex. P2 at 26.) Both parents' compliance with the permanency plan, which was designed to effectuate reunification, has been poor during the pendency of the dependency proceedings in the Juvenile Division of this Court.

**Mother's Housing**

Throughout the related dependency proceedings for B, G, and N, Mother's housing has been inconsistent and unstable. (N.T. I, 36-38, 84-85, 94-95; N.T. II, 32-34.) After she was released from the psychiatric unit, she obtained an apartment in Allentown with financial assistance from a community program but moved out in June of 2023 with intentions to move to North Carolina[7] and returned to Allentown about a month later. (N.T. I, 36-38; N.T. II, 10-12, 14-15.) When she returned to Allentown, she was homeless and staying with a variety of friends. (N.T. I, 38.) Around September of 2023, Mother moved in with Father at his mother's house. (N.T. I, 38.) In October of 2023, Mother left Father for Turning Point, a domestic violence shelter for battered women, but after Thanksgiving of 2023, Mother left the shelter and returned to Father; he was living in York County at the time. (N.T. I, 38-39; N.T. II, 32-34.) After she and Father split up again in January of 2024,[8] she became homeless and resided at times with friends or in hotels or directly on the street. (N.T. I, 84-85.) During the six-month period from April of 2024 through October of 2024, Mother resided in four different places, but she refused to give the Agency an address where the

---

[7]   Mother told the Agency her goal in moving to North Carolina was to be with her family and to establish a job and benefits so she could receive treatment for lupus. (N.T. I, 37.) When she left the Allentown apartment, she was on the verge of being evicted. (N.T. II, 11.)

[8]   The couple separated after another domestic violence episode that took place on the job. *See infra* notes 9, 11, and 13 and accompanying text. Recurring instances of domestic violence recounted by various witnesses who personally witnessed verbal, emotional, and physical abuse between this on-again, off-again couple concern the Court greatly: at the extremes, in one instance, Father punched Mother in the face; in another, he was observed restraining her and she was bleeding; he would call incessantly when they were apart, as much as 25 to 30 times in half an hour, and if she answered he would scream at her, accusing her of cheating on him and blaming her for the children's placement in foster care. (N.T. II, 31-35; also N.T. I, 44-50, 84.)

5

Agency could send her mail or evaluate her housing situation to determine whether it could be appropriate for her children to return to her care. (N.T. I, 94-95.) On the final day of the hearing, June 26, 2025, Mother through her counsel presented a stipulation that, just two months prior, she obtained a one-year lease, and she showed the lease agreement to the current LCOCYS caseworker. (N.T. II, 78-79.) Mother did not testify, and no evidence was adduced as to the nature of the residence, whether it was appropriate for the children, how much Mother pays in rent, or the source of income from which she pays rent. Given her several year history with LCOCYS which has been directly tied to housing instability, and the two and a half years of continuous housing instability in the present matter, the existence of a one-year lease does not convince the Court that Mother has achieved housing stability.

## Father's Housing

Initially, when the children were adjudicated dependent, Father was housed at SCI-Dallas as an inmate. (N.T. I, 16-17, 21.) He was released approximately seven months later on September 6, 2023, and began living with his mother, sleeping on a mattress in her living room. (N.T. I, 45, 48.) He briefly moved to York for about a month, then returned to reside in his mother's apartment. (N.T. I, 48.) During periods Mother was living with Father, they sometimes stayed in paternal grandmother's home and sometimes in a friend's home. (N.T. II, 19.) At the end of January of 2024, Father and Mother were living at a hotel together. (N.T. I, 53.) Thereafter, he returned to his mother's apartment, and up until April of 2024, he reported to LCOCYS that he and his nine-year-old daughter and/or his 12-year-old daughter were living with him at paternal grandmother's apartment. (N.T. I, 77-78; 88.) Meanwhile, though, paternal grandmother reported to LCOCYS

6

that Father was no longer living with her. (N.T. I, 88.) He was incarcerated again on May 9, 2024,[9] at the Lehigh County Jail, transferred to Northampton County Jail on May 13, 2024, and transferred to State Correctional Institute Frackville ("SCI Frackville") where he remained at the time of the termination hearing. (N.T. N.T. I, 102, 105.) Father has not achieved housing stability.

### Mother's Income/Employment

Mother's employment throughout the time her children have been in the Agency's care has been sporadic or non-existent. She briefly worked at a restaurant in February of 2023 for a month but was not able to keep the job. (N.T. I, 22; N.T. II, 12-13.) She obtained brief employment at Coca Cola Park and Dorney Park from April of 2023 to May of 2023 but left because the hours did not suit her. (N.T. II, 12.) In or around June of 2023, Mother reported she obtained a job in North Carolina and sought to transfer her LCOCYS case down south.[10] (N.T. I, 37-38.) After returning to Lehigh County in July of 2023, she struggled to maintain employment. (N.T. I, 40, 84). She missed interviews that were set up for her. (N.T. II, 22.) She and Father did have a job at the same factory or warehouse for a period of time, but on January 26, 2024, they were involved in an altercation with one another and both lost their jobs after Father punched Mother in the face at the workplace.[11] (N.T. I, 49-50, 75-77, 84.) Between April 2024 and November 2024, Mother reported three different jobs to the Agency but did not follow through with providing proof of

---

[9] This incarceration was related to an altercation he had with Mother at their mutual place of employment. *See infra* notes 11 and 13 and accompanying text.

[10] The caseworker informed Mother that the Agency could not guarantee services in another state, and Mother's children remained in Lehigh County. (N.T. I, 37.) *See supra* note 7.

[11] He was arrested and charged with Simple Assault and Harassment; eventually the Simple Assault charge was withdrawn and he pled guilty to Harassment – Subject Other to Physical Contact. (N.T. I, 49-50, 76-77; Ex. P1.)

7

employment; since then, she has reported several short-term jobs, but the Agency was unable to verify her employment.[12] (N.T. I, 97-98.) Mother has not been able to maintain legal income.

### Father's Income/Employment

Father told LCOCYS he obtained work, but he did not verify his income, identify where he was working, or even describe the hours he was working. (N.T. I, 104, 120.) Father mentioned working at a warehouse to the Signature Family Services caseworker but did not provide her with proof of his employment. (N.T. II, 20, 22, 36.) LCOCYS became aware of the job because of the altercation that occurred between Father and Mother while both were on the job that resulted in both parents losing their jobs and in Father's arrest.[13] (N.T. I, 49-50.) Father has not been able to maintain legal income.

### Mother's (and Father's)[14] Cooperation with Reunification/In-Home Services

The Agency referred Mother to Signature Family Services in September of 2022 for reunification services before N, G, and B were adjudicated dependent in January of 2023. (N.T. I, 23; N.T. II, 7.) Initially, the services focused on helping Mother obtain and maintain housing, employment, and mental health services. (N.T. II, 8.) These services terminated in June of 2023 when Mother left for North Carolina but were reinstated on August 15, 2023, after she returned to Allentown. (N.T. II, 14-15.) When Father was released from prison, the Agency added Father to Mother's reunification services, although, as noted *supra* at page 4, this service was not stated as

---

[12] Mother did provide a single pay stub for part-time employment at a Dunkin' Donuts in November of 2024, but the employment was short-lived. She also reported she worked at a factory for a short period, with the elderly as a caregiver, then working overnight as a caregiver, and at the time of the hearing had reported to the LCOCYS caseworker that she was working at a Five Guys restaurant. (N.T. I, 97-98.)

[13] *See supra* notes 9 and 11 and accompanying text.

[14] We address Father's compliance with reunification services although he was not court-ordered to participate.

a requirement for Father in the dependency court-ordered services. (N.T. I, 45, 47; Ex. P2A.) Additional goals were added for Mother to work on a parenting program, increase parenting skills, and develop coping skills. (N.T. II, 16.)

Father's reunification goals as provided to Signature Family Services by the Agency were to obtain and maintain housing, obtain and maintain employment, follow through with a drug and alcohol evaluation and any recommended treatment, increase parenting skills, and develop coping strategies. (N.T. II, 16-17.) However, Father refused to participate or cooperate with services provided by Signature Family Services. (N.T. I, 48; N.T. II, 20, 45-46.) Both parents were discharged unsuccessfully on November 29, 2023, as a result of lack of cooperation, last-minute cancellations, and no-shows. (N.T. II, 25.) Both times Mother was discharged from Signature Family Services, she made only limited progress with the reunification goals. (*See generally* N.T. II, 7-59 (testimony of Felicia Banuchi).)

In January, the Agency referred both parents to JusticeWorks for reunification services after the parents requested a new provider because Signature Family Services tended to hold them accountable for domestic violence in their interactions. (N.T. I, 53.) They were discharged unsuccessfully from JusticeWorks on March 7, 2024, due to lack of compliance and failure to maintain in-person contact with the assigned workers. (N.T. II, 25, 63-65.) The goals at that time were to achieve sustainable housing and employment, to work on parenting skills, and to engage in visitation with their children. (N.T. II, 63.) At the time of discharge, they had not met any of the reunification goals. (N.T. II, 63-65.)

Thereafter, Father opted to work on reunification goals such as employment and housing on his own. (N.T. I, 93-94.) Mother was referred to a third reunification provider through Valley Youth House in May of 2024. She was noncompliant and did not meet with the initial assigned

9

Valley Youth House caseworker, but since the assignment of a new caseworker, Mother was compliant with working on the reunification goals, except that she did not address the mental health component of her reunification goals. (N.T. I, 98-99, 117.)

### Mother's Mental Health Evaluation and Treatment

Mother's self-reported mental health history includes bipolar disorder, depression, and anxiety. (N.T. I, 58 153.) At the time of her discharge from the psychiatric unit in early 2023, Mother was prescribed medication, but it appears she did not see value in taking the medication regularly and was not compliant with her prescribed regimen. Throughout the majority of the dependency proceedings, she did not attend mental health therapy, and when she did attend, she attended only sporadically. (N.T. I, 22, 25-26, 41, 58, 98-99; N.T. II, 40-41.) Her Signature Family Services reunification caseworker, Felicia Banuchi, tried to set up mental health treatment appointments for her with the Hispanic American Organization ("HAO"), but Mother failed to attend. (N.T. II, 13-14.)

We note that LCOCYS caseworker Amy Herczeg indicated Mother attended HAO for mental health treatment only sporadically and inconsistently while Ms. Herczeg was involved with the family. (N.T. I, 58.) Mother indicated she was being treated for bipolar disorder and anxiety at HAO around the time of the October 2023 permanency review hearing, but she did not provide documentation to the Agency regarding her alleged treatment with HAO. (N.T. I, 58-59.) Mother also reported she was working on mental health with HAO during the review period leading to the April 2024 permanency review hearing, but the Agency was unable to verify whether Mother's claims were accurate because HAO did not respond to the Agency's request for information. (N.T. I, 85-86.)

At Mother's request, Ms. Banuchi then made a referral for Mother to Preventative Measures, but Mother did not respond to their attempts to contact her. (N.T. II, 14.) Mental health appointments were also scheduled through Valliere and Counseling Associates with Vickie Moyer in December of 2024 and January and February of 2025 in connection with protective parenting treatment, but Mother did not attend the appointments despite multiple attempts by Ms. Moyer to be flexible in order to work with Mother's availability. (N.T. I, 196-201.)

### Mother's Protective Parenting Evaluation and Treatment

With respect to the requirement in the dependency proceedings for N, G, and B that Mother undergo a protective parenting evaluation, it is worth noting that she was involved in a protective parenting evaluation in 2020 when her older children were in the Agency's care. (N.T. I, 22.) This included a psychological evaluation on September 21, 2020, performed by Dr. Falynn Strohl, Psy.D., the report of which was made part of the record as Exhibit P5. At that time, then-seven-month-old N was in Mother's care in addition to Mother's older two children who are not part of this termination proceeding, and Mother was pregnant with G. (N.T. I, 25, 151-52.) At that time, Dr. Strohl recommended that Mother needed to engage in a violence prevention program, a protective parenting treatment program, and mental health therapy to address bipolar disorder, narcissistic personality disorder, anxiety, and depression, and that Mother needed an updated psychiatric evaluation and to follow all resulting recommendations, which could include medication management. (N.T. I, 152-53, 163-64.) Unfortunately, Mother did not follow through with any of these recommendations.[15] (N.T. I, 22.)

On May 22, 2023, Mother submitted to a second protective parenting evaluation, this time with Dr. Bradley Beckwith, Psy.D., of Valliere & Counseling Associates. (N.T. I, 178.) The

---

[15] *See supra* note 3.

Agency asked Dr. Beckwith "to assess Mother's parenting ability, her understanding of keeping her children safe, maintaining a safe household for the children, managing any risk that may happen there, as well as other factors about herself that would also impact her role as a parent . . . such as maintaining her mental health and stability as a whole." (N.T. I, 173; *see also* Ex. P6 at 1.) In conducting the evaluation, Dr. Beckwith considered Dr. Strohl's prior evaluation and the testing she conducted on Mother; then he both conducted additional testing and engaged in approximately two-and-a-half hours of clinical interviews with Mother. (N.T. I, 173-175, 178; Ex. P6 at 2.)

Dr. Beckwith found Mother to be emotionally detached from her children and "more invested in portraying herself as a victim or denying or minimizing what had actually happened [in the near fatality of her infant, B] rather than considering this as an opportunity to repair some potential deficits in her parenting." (N.T. I, 182-85; Ex. P6 at 6-7.) In addition, she was resistant to being challenged about anything about her parenting and saw herself as a very effective parent, in spite of ongoing involvement with LCOCYS for several years. (N.T. I, 183.) Additionally, he was troubled that Mother was not attending mental health therapy or taking her medications; in fact, she was not interested in taking her mental health medications regularly, even though she described herself as having bipolar disorder, depression, and anxiety, which is problematic because mood stabilizing medications require several weeks of consistent use to achieve therapeutic benefit. (N.T. I, 182-83, 185.) Mother, however, wanted to take medications only when she felt poorly, when she thought she needed them. (N.T. I, 183.) Mother's failure to participate in mental health treatment and take prescribed medications was particularly problematic in regard to Mother's bipolar disorder, as treatment is important in order for a parent to be able to be stable to care for themselves and for their children. (N.T. I, 186-87.)

12

Dr. Beckwith's report of the evaluation was admitted as Exhibit P6. Many of the recommendations contained in Dr. Beckwith's report repeat the recommendations Dr. Strohl originally made in 2020. Dr. Beckwith recommended:

- [Mother] should not be the primary caretaker for any of her children. Her ability to provide a safe environment conducive to raising children is impaired.
- [Mother] will likely require therapeutic and professional supervision to monitor her interactions with her children.
- [Mother] requires protective parenting treatment. This treatment should include individual and group therapy if available.
- [Mother] would benefit from parenting education classes. These classes should emphasize effective child development, basic child care, and how to understand a child's needs if they do not specifically vocalize them.
- [Mother] needs to re-engage with her mental health treatment. Her treatments should focus on education about her diagnoses, knowledge about precursors and coping skills.
- [Mother] requires an updated psychiatric evaluation if one has not already been given. The psychiatrist should be provided copies of this report, Dr. Strohl's report, and any of ████████ hospitalization records.
- [Mother] needs to demonstrate more consistency and accountability with her medication compliance. This is an important part in her role as a parent and her overall mental health.
- It is unclear if [Mother] completed her violence treatment as recommended in the 2020 evaluation. If she has not, she should re-engage with this treatment and complete the program.
- [Mother]'s prognosis is guarded to poor. She reported previously abandoning treatment due to not being aware of how long the process takes. Protective parenting, violence, and mental health treatment should not have completion or end dates. The length of treatment is determined by the person's individual needs, their investment in treatment (or lack there of), insight, and overall learning ability. [Mother] presents with a borderline intellectual functioning, so there are some impairments in her learning ability. She also has minimal insight into herself and her personality testing revealed narcissist and histrionic characteristics – which would create additional obstacles in her treatment compliance.
- Any provider working with [Mother] should be made aware of her cognitive limitations, lack of insight, dismissiveness, and personality characteristics. They should have experience in working with individuals with similar characteristics and adapt the therapeutic approach accordingly.

13

(Ex. P6 at 8-9.)

Mother scheduled and attended an intake appointment for protective parenting treatment with Valliere and Counseling Associates on December 19, 2024. (N.T. I, 197.) However, she did not attend any appointments that were scheduled for her in December, January, or February for group therapy or individual therapy, and she was discharged from the program for failure to attend. (N.T. I, 197-201.) At the time of the termination hearing, Mother had not engaged in any of Dr. Beckwith's treatment recommendations except that she was not the caregiver to any children and her visits with her children were professionally supervised, both of which were a direct result of LCOCYS' oversight and court orders rather than Mother's own compliance.

### Mother's Visitation (and Father's)[16]

Mother's visits with the children were originally at the Comfort Cottage in Allentown, but they were moved to the Government Center after an incident when Mother became verbally aggressive and behaved in a manner that caused LCOCYS staff to call police. (N.T. I, 42-43.) Before and after her time in North Carolina, Mother missed several visits and canceled last minute; often when she canceled late, she said it was due to her not feeling well because of having lupus. (N.T. I, 44.) While Mother was living in Allentown, the Agency worked with her to alter her visit schedule during the times she had a job. (N.T. I, 44-45.)

Mother began to attend visits with Father after his release from SCI-Dallas in September of 2023. (N.T. I, 45.) During joint visits, the parents exhibited a variety of problematic behaviors. They told one of the children while she was upset that they would not come visit her if she was upset, which naturally served to upset the child even further. They missed visits, two of which

---

[16] We address Father's compliance with supervised visitation although he was not court-ordered to participate.

14

included two of the children's birthdays. In addition, they tended to argue with one another in front of the children, repeatedly, even after both were told this was not permitted and that visits would have to end early if they continued to argue. Mother was unable to be redirected from these verbal altercations. (N.T. I, 44-45.) Father was offered additional visits separate from the joint visits he engaged in with Mother, but he declined. (N.T. I, 48-49.) He did not have any visits with the children for a month while he was living in York, Pennsylvania, and did not attend any visits during December of 2023. (N.T. I, 70.)

Mother and Father attended visits sporadically until January of 2024. Starting in February of 2024, Mother stopped communicating with the Agency, and neither parent visited with the children for approximately two months until March 26, 2024, when Mother, Father and the children had a visit arranged by the LCOCYS caseworker. (N.T. I, 87-88.) After that visit, Mother did not visit the children again for four months, until October 2, 2024. (N.T. I, 100-101.)

Mother's visits were scheduled to occur once a week for an hour, but due to her sporadic and inconsistent attendance, visits were reduced to once every other week for one hour at the Comfort Cottage. In the last review period prior to the termination hearing, Mother has been fairly consistent with attendance. (N.T. I, 100, 116.) She frequently brings snacks for the children, stays focused on and engaged with the children, and mutual affection is expressed between Mother and the children at the visits. (N.T. I, 114-16.)

## DISCUSSION

### Statutory Grounds

The Agency filed petitions to terminate the parents' rights on September 9, 2024. Eleven grounds for involuntary termination are set forth in 23 Pa. C.S. §2511. In order to succeed,

15

LCOCYS must establish at least one statutory ground for termination. The statute provides, in pertinent part:

### § 2511. Grounds for involuntary termination

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

....

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

....

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date or removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

....

(b) Other considerations. The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parents. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described

16

> therein, which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. §2511.

First, the court must assess the parent's conduct to determine whether LCOCYS has established by clear and convincing evidence the statutory grounds alleged for termination of parental rights. Santosky v. Kramer, 455 U.S. 756 (1982). Only if statutory grounds for termination have been established does the court engage in the second inquiry, which is whether termination meets the child's needs and welfare. In re Adoption of R.J.S., 901 A.2d 502, 508 (Pa.Super. 2006). Implicit in this analysis is an evaluation of the emotional bond between parent and child with close attention to be paid to the effect on the child of permanently severing any bond that does exist. Id. The petitioner has the burden of producing evidence that is so clear, direct, weighty, and convincing as to enable the court to come to a clear conviction, without hesitation of the truth, of the precise facts at issue. In re: Child M, 681 A.2d 793, 797 (Pa.Super. 1996). The court must examine the circumstances of the case and also consider all explanations offered by the parent to determine whether the evidence, in light of the totality of the circumstances, clearly warrants involuntary termination. Matter of Adoption of Charles E.D.M. II, 708 A.2d 88, 91 (Pa. 1998).

All children are entitled to certain irreducible minimum requirements from their parents, including adequate housing, clothing, food, love and supervision. In re J.W., 578 A.2d 952, 958 (Pa.Super. 1990). "[A] parent's basic, constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or potential in a permanent, healthy, safe environment." In re B., N.M., 856 A.2d 847, 856 (Pa.Super. 2004).

17

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support.
>
> . . .
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

Id. at 855 (citations and internal quotations omitted). "The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state may properly be considered unfit and have his parental rights terminated." In re B.L.L., 787 A.2d 1007, 1013 (Pa.Super. 2001).

The Agency's petitions ask this Court to terminate Mother's and Father's parental rights pursuant to 23 Pa. C.S. §2511(a)(1), (2), (5), and (8). Statutory grounds for termination are clearly and convincingly met with respect to both parents; however, due to Father's incarceration when the children were removed from Mother's care, the Court finds that subsections (a)(5) and (a)(8) of §2511 do not apply to Father in this case.

These children have been in the care and custody of LCOCYS since January of 2023. The hearing in this matter concluded on June 26, 2025. In these two and a half years, Mother and Father made little to no progress with the concerns that caused the children to be adjudicated dependent. Father was incarcerated when the children came into the Agency's care, and he was incarcerated again when the hearing of the within matter took place. When he was not incarcerated, he did submit to paternity testing regarding B as required (N.T. I, 53, 120) and presented himself as a resource for the children on September 7, 2023, the day after he was released from prison (N.T. I,

18

23, 45-47, 120), but he had little interest in demonstrating to LCOCYS that he obtained and maintained stable income and housing so that he could step up as a parental resource for the children. Mother has not addressed her mental health needs, engaged in protective parenting treatment, or demonstrated that she is capable of maintaining stable housing and income. Without these important issues being addressed, Mother is not able to safely care for the children.

During this two and a half years, neither parent performed parental duties or took the steps necessary to provide the children with the essential parental care, control, or subsistence they need for their physical and mental well-being.[17] Neither Mother nor Father provided shelter, clothing, nutrition (with the possible exception of snacks during supervised visits), guidance, discipline; neither Mother nor Father bathed the children, tucked them into bed, took them to medical appointments, or comforted them when they were scared. Instead, for two and a half years, foster families stepped in to fulfill a parental role for these young children. Statutory grounds for termination of parental rights were clearly and convincingly met under 23 Pa. C.S. §2511(a)(1) and (2). "Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." In re Adoption of B.G.S., 245 A.3d 700, 706–07 (Pa. Super. 2021), reargument denied (Mar. 11, 2021); see also In re Z.S.W., 946 A.2d 726, 732 (Pa. Super. 2008) (holding child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting").

---

[17] We note that counsel for Mother asserts at page 8 of the *Proposed Findings of Fact and Conclusions of Law of Counsel for the Mother* that Mother performed basic parental duties to the children since they were brought into the Agency's care, but counsel did not cite facts to support the statement and the statement is not supported by the record.

19

With respect to Mother, the Agency also proved clear and convincing grounds under §2511(a)(5) and (8). Only since spring/summer of 2024 has Mother exhibited willingness to work on reunification goals she must accomplish in order to regain custody of the children, but she still refuses to work on the mental health component, which is a key factor for Mother to be able to safely provide parental care for her children. Mother's participation in mental health treatment and focusing on her diagnoses and coping skills, especially how they affect her ability to parent, was a key component to reunification. (N.T. I, 25, 42, 104-05, 181-82, 186-87.) Mother did not actively attend to her mental health issues when LCOCYS was involved with her older children, either, which presented concerns about her ability to safely and appropriately parent her children back in 2020. (N.T. I, 152-53, 160-62.)

To date, those concerns have not been alleviated. Mother was still not in a position to assume custody of the children in terms of stable housing, stable income, stability with her own mental health treatment, or undertaking protective parenting treatment that she requires. Mother has not remedied her failure and refusal to provide essential parental care for the children in a reasonable time, in excess of the six-month and 12-month time frames established by 23 Pa. C.S. §2511(a)(5) and (8).

Services and assistance were available to Mother that were designed to effectuate reunification and help her remedy the conditions that led to the children's removal, but she did not avail herself of the available services in a meaningful way, and, even when working with reunification services, she did not make progress with the reunification goals. Rather than graduating to unsupervised visitation, Mother's court-ordered supervised visitation was actually reduced because of her sporadic attendance for prolonged periods of time. Nothing in the record suggests that giving Mother more time and offering her more services will help her alleviate the

safety concerns that caused the children to be removed from Mother and placed in the foster care system, and to give her more time would needlessly serve to prolong the children's involvement with the foster care system. In the two and a half years that Mother has not been able to summon the internal resources to do what it takes to regain custody of her children, they have been shuffled about the foster care system and are finally together in one home with a couple who has the trauma training and empathy to help these children through their issues.

A court may terminate parental rights under section 2511(a)(1) when the parent demonstrates a settled purpose to relinquish parental claim to a child or fails or refuses to perform parental duties for at least six months prior to the filing of the termination petition. In re: I.J., 972 A.2d 5, 10 (Pa.Super. 2009). "Although the six-month period immediately preceding the filing of the petition is most critical to the analysis, the court must consider the whole history of the case and not mechanically apply the statutory six-month statutory provision." Id. (citing In re: K.Z.S., 946 A.2d 753, 758 (Pa.Super. 2008)).

After careful consideration of all the evidence presented in this case, we conclude that LCOCYS clearly and convincingly proved that Mother's conduct satisfies statutory grounds for termination pursuant to §2511(a)(1), (2), (5), and (8). LCOCYS clearly and convincingly proved that Father's conduct satisfies statutory grounds for termination pursuant to §2511(a)(1), and (2).

### Children's Needs and Welfare

Having determined that statutory grounds for involuntary termination were met with respect to both parents, the Court must now turn to the most important consideration, which is the children's needs and welfare pursuant to 23 Pa.C.S. §2511(b), including the impact of breaking any bond the children may still have with Mother or Father.

21

The children have no bond with Father. He has not had any visits with them since March 26, 2024. Even before that, his visits were sporadic at best. Therefore, termination of his parental rights will not be harmful to the children and will, in fact, promote their needs and welfare.

Throughout most of the past two and a half years, Mother's visits were sporadic and often canceled by her. After the agency filed the instant Petition for Involuntary Termination of Parental Rights and during the last review period prior to the termination hearing, Mother began to become fairly consistent with her attendance at the visits. (N.T. I, 116.) She now knows to bring snacks and engages with the children. The children now have an affection with Mother that she also reciprocates.

The children have a loving bond and significant relationships with the foster family where they are able to be together with a couple who has the trauma training and empathy to help the children through their issues. The foster family tends to the day-to-day needs and health concerns of the children. All of their medical needs, special needs, and developmental needs are consistently met by the foster family. The foster family loves the children and are willing to adopt of three children.

Children need and deserve stability, security, consistency, nurturance, and permanency. They need to be able to count on their caregivers to provide them with the security and stability they crave. Mother is still unable to provide the children with these intangible (but significantly important) needs. At this point, the Court perceives that Mother is an occasional visitor who the children have started to show an affection for. The Court finds that the need the children have for security and stability, which their foster family aptly provide and with whom they have a positive, strong bond, is more important than the bond they have or may have with Mother. The foster parents are ready, willing, and able to provide the children with a permanent, stable home and

22

consistent nurture, which Mother and Father have been unable to do. Given the totality of the circumstances of this matter, the benefits of stability and permanency in this stable, consistent, loving home outweigh any potential detriments that may occur due to severance of the bond the children may be starting to have with Mother. We therefore find it best serves the children's needs and welfare to terminate both parents' rights so they can achieve permanency with this loving, secure, nurturing and stable foster family.

**BY THE COURT:**

Date: December 29, 2025

_____
MELISSA T. PAVLACK, J.